UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MYRNA PINEIRO
    Plaintiff,

v.                               CASE NO.: 6:22-cv-01574

EMERGE HEALTHCARE GROUP, LLC
FCID MEDICAL, INC.
FIRST CHOICE MEDICAL GROUP OF BREVARD, LLC
FIRST CHOICE HEALTHCARE SOLUTIONS, INC.
LANCE FRIEDMAN,
    Defendants.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW**, Plaintiff, MYRNA PINEIRO ("Plaintiff") by and through the undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, and the Local Rules for the United State District Court, Middle District of Florida, and hereby files Plaintiff's Motion for Summary Judgment and Incorporated Memorandum of Law, and in support states as follows:

## I.      INTRODUCTION

Plaintiff was an hourly employee who worked for the Defendants' failing healthcare business. As a benefit of her employment, Plaintiff was eligible to participate in an employer sponsored benefits plan which provided health insurance. Plaintiff participated in the plan and in 2021 and 2022, Plaintiff had deductions from her pay to cover premiums. Unfortunately, Defendants failed to pay the insurance carriers and the group plans were cancelled. Despite the cancellation, Defendants retained the insurance premiums that Plaintiff paid for periods when she was not

insured. Soon thereafter, Defendants stopped paying Plaintiff her wages altogether. Despite numerous excuses and promises that pay was coming, it never did.  Plaintiff worked a total of 251.38 hours for which she was not paid.

Defendants do not dispute that they made deductions from Plaintiff's pay during periods when she was not covered by their insurance plan. They also do not dispute that Plaintiff worked without pay and that she is owed back wages.

This action seeks to recover the wages and benefits owed to Plaintiff.

## II.    PROCEDURAL HISTORY

1. On August 26, 2022, Plaintiff filed her four (4) count complaint[1] against Defendants alleging:

> Count I: violation of the Fair Labor Standards Act(FLSA) (minimum wage)
> Count II: Violation of the Florida Minimum Wage Act (FMWA)
> Count III: Common Law Unpaid Wages
> Count IV: Violation of Employee Retirement Income Security Act of 1974 ("ERISA")

2. On September 27, 2022, Defendants filed their Answer and Affirmative Defenses which was a general denial of the allegations made in the complaint.

## III.    STATEMENT OF FACTS

3. Historically, Defendants had been one of the largest physical therapy providers in Brevard County, Florida and provided orthopedic medicine specializing in

---

[1] Doc. 1.

orthopedics, spine surgery, neurology interventional pain management and related diagnostics.[2]

4. First Choice Healthcare Solutions, Inc. (**First Choice**) is a Delaware corporation created in 2011 and is the parent company of the affiliate Defendants. First Choice was registered with the U.S. Securities and Exchange Commission [3]

5. FCID Medical, Inc. (**FCID**) is a Florida corporation created in 2010. FCID employe non-licensed/non-biller medical staff such as front desk staff and medical billing specialists and owns fixed assets. FCID is wholly owned by First Choice. [4]

6. Providing medical care to patients is conducted via First Choice Medical Group of Brevard, LLC. (**Medical Group**) Medical Group is a Delaware limited liability company that was created in 2011. Medical Group relies on payments from insurance companies, Medicare and Veteran's Administration ("VA"). Medical Group is wholly owned by FCID. [5]

7. In 2020, First Choice, Medical Group, and FCID filed for Chapter 11 bankruptcy and had their cases jointly administered.[6]

8. Following the bankruptcy, Medical Group started using EMERGE HEALTHCARE GROUP, LLC ("**Emerge**") as a fictitious name. [7]

---

[2] First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 2, p. 2. (Bankr. M.D. Fla.)
[3] *Id.*
[4] *Id.* at p. 3
[5] *Id.* at p. 2-3
[6] First Choice Healthcare Solutions, Inc., 6:20-bk-03355 (Bankr. M.D. Fla.)
[7] Friedman Dep. 19:20-20:8.

**Plaintiff's Employment**

9.  In or about April 2021, Plaintiff started working for Defendants as a Front Desk Administrative Assistant at a rate of $15.00 per hour, plus benefits which were part of an employee welfare benefit plan.[8]

10. Plaintiff was provided with a Florida Blue, Blue Options policy which was to run through July 2022.

11. During this time, Plaintiff's paychecks came from FCID and show deductions for insurance. Initially, there were deductions of $113.68 from each paycheck for insurance, including dental and medical. [9]

12. Unbeknownst to Plaintiff, the Florida Blue policy was canceled on November 30, 2021, but the payroll deductions continued. [10] This plan was never reinstated.[11]

13. In or about April 2022, Plaintiff's paychecks started to come from Medical Group.[12]

14.  On April 1, 2022, Plaintiff was provided a plan under United Healthcare.

15. Plaintiff's paystubs indicate that $151.61 was deducted from her paychecks for insurance until the end of her employment on July 27, 2022[13], however, she was not covered.

---

[8] Doc. 16
[9] See, E.g., **Exhibit A, p. 85**
[10] Lee Dep. 49:22-50:19; Hardesty Dep. 45:1-9.
[11] Lee Dep. 59:15-24.
[12] **Exhibit B**
[13] **Exhibit B**

16. Both insurance policies were canceled due to Defendants' failure to remit payment, despite making deductions from Plaintiff's paychecks.[14] In fact, Defendants never paid any money to United Healthcare and the plan was canceled as though it never existed. [15] Defendants were unable to pay United Healthcare because they had made payments to Defendant Friedman and CFO Phil Keller.[16]

17. The payroll deductions were kept in Defendants' general operating account, including payroll taxes and insurance. [17] Those payroll taxes were never paid to the IRS. [18]

18. Between December 16, 2021, and September 1, 2022, Plaintiff made multiple insurance claims under her insurance policies. These claims were denied for lack of coverage. Plaintiff had $35,999.31 in medical charges which should have been covered but for the lack of coverage.[19] [20]

19. Between June 13, 2022, and her final day on July 27, 2022, Plaintiff worked 251.38 hours, but has not been paid for those hours. [21] Additionally, July 4, 2022, was a paid holiday for which Plaintiff has not been paid.[22]

---

[14] Lee Dep. 59:15-24.
[15] Hardesty Dep.56:22-57:7; 62:3-13.
[16] Hardesty Dep. 66:7-11.
[17] Hardesty Dep.46:8-20
[18] Hardesty Dep.46:21-47-3.
[19] **Exhibit C**
[20] Medicare became Plaintiff's primary insurer during this period, leaving Plaintiff out of pocket $2,716.62.
[21] Doc. 16, **Exhibit B**
[22] Friedman Dep. 55:3-5.

5

20. Pursuant to Fla. Stat. 448.110(6)(a), Plaintiff notified her employer of the alleged violations of Fla. Stat. §448.110. The parties have not been able to resolve any of the issues between them and Plaintiff remains unpaid. [23]

**Single Enterprise/Joint Employer**

21. First Choice is the parent company of the remaining, wholly owned corporate defendants. [24] FCID, in turn, is the holding company for FCMG. [25] Despite being a registered, Florida limited liability company, Defendants maintain that "Emerge Healthcare Group, LLC" is merely a fictitious name, or DBA, owned by FCMG which was set up to transition to after their 2020 bankruptcy. [26]

22. As the parent company, First Choice would transfer funds to FCID and FCMG to cover operating expenses, such as payroll.[27] This was necessary because, despite having employees, FCID had no revenue; It was the holding company for FCMG. [28] Defendants provided a detailed explanation of these intercompany transactions in their bankruptcy proceedings. [29] Therein, Defendants explain that these intercompany transactions are, "integral to ensure the [Defendants] ability to operate their businesses…"[30]

---

[23] Doc. 16-1
[24] Hardesty Dep. 10:13-18; 11:6-9.
[25] Hardesty Dep.  14:15-25
[26] Hardesty Dep.  25:4-21; 26:10-28:20; Lee Dep.  14:14-21; 37:4-38:6.
[27] Friedman Dep. 109:4-24.
[28] Hardesty Dep.14:1-22.
[29] First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 38, p. 3-8. (Bankr. M.D. Fla.)
[30] Id. at p. 10, ¶36.

23. In April 2022, administrative staff working for under FCID were merged into FCMG for payroll purposes but continued to be reported as liabilities on the FCID profit and loss. Despite employee paychecks coming from a different entity, Defendants claim that this was merely administrative and clerical. The affected employees' job duties did not change after the transition.[31] Indeed, despite being paid by FCMG, and receiving W2s from FCMG, Defendants considered those affected employees to still be "FCID employees". [32]

24. Although they haven't filed taxes since 2019[33], the Defendants would file joint, consolidated tax returns.[34] Defendants' gross revenues were not broken up by entity.[35] They reported consolidated statements of operations for the enterprise[36]. Defendants had millions of dollars in revenues for the years 2020 - 2022[37]

25. In their jointly administered, chapter 11 bankruptcy proceeding, Defendants filed their post confirmation schedule of receipts and disbursements covering 2021, wherein:

   a. **First Choice** reported $1,410,783.35 in income during the fourth (4th) quarter of 2021, and $ 6,182,408.31 in income during between February 22, 2021, and December 31, 2021.[38]

---

[31] Hardesty Dep. 15:2-24
[32] Hardesty Dep.16:2-21; Lee Dep.  14:14-15:12.
[33] Hardesty Dep. 13:3-5.
[34] Hardesty Dep. 11:18-25.
[35] Hardesty Dep.  40:20-24.
[36] Friedman Dep. 53:3-15.
[37] **Exhibit D**; Hardesty Dep.42:13-15; 42:24-43:4; Friedman Dep. 86:3-5.
[38] First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 507, p. 3. (Bankr. M.D. Fla.)

b. **Medical Group** reported $2,444,954.54 in income during the fourth (4th) quarter of 2021, and $7,444,218.81 in income during between February 22, 2021, and December 31, 2021.[39]

c. **FCID** reported $ 944,168.08 in income during the fourth (4th) quarter of 2021, and $3,625,535.99 in income during between February 22, 2021, and December 31, 2021.[40]

26. Defendants also shared common leadership[41], offices, human resources, and healthcare group plans. [42] Indeed, in their motion for joint administration of their bankruptcy proceedings, Defendants admit that they are affiliates of one another and "share a common, ownership, management and operational structure." [43]

**Lance Friedman's Operational Control.**

27. Mr. Friedman is the CEO or managing member of each of the corporate Defendants and the ultimate decision maker. [44] He had the authority to sign checks, including payroll checks[45], on behalf of the enterprise and bind the companies in financial decisions. [46]

---

[39] First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 509, p. 4. (Bankr. M.D. Fla.)
[40] First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 508, p. 3. (Bankr. M.D. Fla.)
[41] **Exhibit E;** Friedman Depo. 110:6-11.
[42] Hardesty Dep. 10:20-11:11; Lee Dep. 10:10-16. **Exhibit F**
[43] First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 3, p. 3. (Bankr. M.D. Fla.)
[44] Lee Dep.  30:8-18; 38:11-18
[45] See, Eg. **Exhibit G**, p. 51-52.
[46] Lee Dep.  35:5-20.

28. Mr. Friedman was responsible for operational decisions such as moving units of employees from one location to another and negotiating the leases for those locations. [47]

29. Mr. Friedman was also tasked with bringing in capital, investors, and fundraising. This required Mr. Friedman to travel and communicate with investors from outside the state of Florida, as most investors were not located in Florida. [48]

30. As it pertains to payroll for employees, Mr. Friedman had the final approval of payroll and whether employees were paid. Each pay period, payroll documents would be submitted to the controller, Ms. Hardesty, who then sent the reports to Mr. Friedman for approval.  If Mr. Friedman did not approve, employees were not paid. [49]

31. When employees were transitioned on Defendants' books from one entity to another, Mr. Friedman was the ultimate decision maker. [50]

32. For each of the payroll periods at issue, payroll was submitted to Mr. Friedman, however he did not approve, and therefore employees, including Plaintiff, were not paid. [51]

---

[47] Lee Dep. 32:13-18; 33:23-25; 34:23-25.
[48] Lee Dep. 30:8-12' 31:6-32:4; Friedman Depo. 107:24-108:2.
[49] Hardesty Dep.  34:25-36-10.
[50] Lee Dep.  35:1-4.
[51] Hardesty Dep.  36:12-24.

33. When Defendants knew that they could not afford to pay their employees, Mr. Friedman allowed the employees to continue working, nonetheless. [52]

34. When employees' employment ended, including Plaintiff's employment, they were not paid their back wages. The decision not to pay former employees, including Plaintiff, was made by Mr. Friedman. [53]

35. During 2021 and 2022, leadership sent many emails to employees regarding payroll and insurance.[54] If these emails did not come directly from Mr. Friedman, they were reviewed and approved by Mr. Friedman before being sent to employees. [55]

36. When negotiating reinstatement of employee benefits i.e. health insurance, Mr. Friedman made the decision not to move forward. [56]

37. Mr. Friedman was also involved in the unlawful scheme to misclassify all employees as independent contractors while the enterprise was under an active Department of Labor investigation and after numerous employees had already initiated lawsuits to recover their unpaid wages. [57]

**Engaged in Commerce**

---

[52] Lee Dep.  20:20-24.
[53] Hardesty Dep.  38:12-24. Lee Dep.  26:16-22.
[54] **Exhibit H**
[55] Lee Dep.29:6-11.
[56] Lee Dep.  60:4-61:3
[57] Lee Dep.  81:3-18

38. First Choice Medical Group of Brevard, LLC relies on Athena cloud-based services ("Athena") for its operations and patient care.[58] Athena electronically handles from beginning to end a patient's care, including but not limited to, scheduling and calendaring of medical appointments, reminders and follow-up care appointments, collects and logs patients' payments at time of office visit, verifies insurance eligibility, maintains patient information, handles claim management, prepares insurance claims, assists with storing and processing electronic health records ("EHR") and accounts receivable management and reporting.[59] Athena Health is a Massachusetts based company.[60]

39. Athena is integrated with US Bank with respect to all payments for medical services, excluding in-person payments made by a patient at the time of an office visit. This integration allows Athena to keep track of payments and assign payments to specific claims (i.e. accounts receivable) in the Athena system. As a result, US Bank receives electronic fund transfers ("EFT") and checks from third parties such as insurance, Medicare and VA, plus merchant services, on a daily basis.[61]

---

[58] "Cloud computing is the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself." *Riley v. California, 573 U.S. 373, 397, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014)*

[59] First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 38, p. 3. ¶11-13 (Bankr. M.D. Fla.); Friedman Dep. 105:14-106:21.

[60] https://www.athenahealth.com/about/contact-us (last visited August 25, 2023.)

[61] First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 38, p. 3. ¶11-13 (Bankr. M.D. Fla.); Friedman Dep. 105:14-106:21.

40. In furtherance of their job duties, Defendants' employees used leased medical equipment, such as MRI machines, ultrasound machines, and X Ray machines. This equipment originated outside the state of Florida and was leased through non-Florida companies. By way of example, First Choice and Medical Group leased FujiFilm Sonosite S II ultrasound systems from US Bank. [62] FUJIFILM Sonosite, Inc. is headquartered in Bothell, Washington. [63] US Bank is a Delaware corporation headquartered in Minnesota. [64] The X-Ray and MRI machines used by Defendants employee were manufactured by General Electric, a New York company headquartered in Boston, Massachusetts. [65]

41. Defendants also distributed durable medical equipment, such as knee splints or crutches. This equipment came from vendors such as Henry Schein, a New York company, and was sold or prescribed by one of the seven orthopedic doctors working for Defendants. [66]

42. Henry Schein was also Defendants' vendor for a plethora of different supplies, including prescription drugs and injectables.[67] Henry Schein, Inc. sued Defendants

---

[62] **Exhibit I**; US Bank v. First Choice Medical Group of Brevard, LLC, et al. Case No.:05-2022-CA-058436

[63] https://www.sonosite.com/ (last visited August 28, 2023)

[64] https://ir.usbank.com/investor-relations/corporate-profile (last visited August 25, 2023.)

[65] Friedman Dep. 94:22-97:24.

[66] *Id.*

[67] Friedman Dep.104:25-105:13.

in 2023 over unpaid invoices which provide a snapshot of different items supplied to Defendants for use by their employees. [68]

43. Defendants also held contracts to provide physical therapy services to cruise line employees while they were docked at Port Canaveral. Defendants' serviced employees of Royal Caribbean, Norwegian, Carnival, and MSC. [69]

44. Defendants' employees used interstate lines of communication, such as the internet, email, and telephones, to negotiate and communicate employment contracts with prospective doctors and investors.[70]

45. The TD Bank checks disclosed in their Bankruptcy proceedings show that Defendants wrote checks, including payroll checks, from their TD Bank account with an ACH Routing Number 067014822.[71] This routing number corresponds to a TD Bank location in Lewiston, ME. [72]

## AUTHORITY AND ARGUMENT

### Counts I & II FLSA/FMWA

A plaintiff seeking unpaid minimum wages under the FLSA must establish: (1) the defendant employed the plaintiff; (2) the plaintiff engaged in interstate commerce or

---

[68] **Exhibit J.**
[69] Friedman Dep. 99:8-100:7.
[70] Friedman Doc. 103:16-104:14.
[71] See, e.g. First Choice Healthcare Solutions, Inc., 6:20-bk-03355, Doc. 509, p. 55(Bankr. M.D. Fla.)
[72] https://bank.codes/us-routing-number/067014822/ (last visited August 25, 2023.)

the defendant was an enterprise engaged in interstate commerce; and (3) the defendant failed to pay the plaintiff the applicable minimum wage. *Wallace v. The Kiwi Grp., Inc.*, 247 F.R.D. 679, 682 (M.D. Fla. 2008) (citation omitted).

Pursuant to Fla. Stat. §448.110(3), a plaintiff must show that they are entitled to minimum wage under the FLSA to be eligible for state minimum wage pursuant to s. 24, Art. X of the Florida Constitution. Therefore, to establish a claim for unpaid minimum wages under the FMWA, Plaintiff must show coverage under the FLSA.

### a.  Enterprise Coverage

The FLSA defines "an enterprise engaged in commerce or in the production of goods for commerce" in relevant part, as an enterprise that

> (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated) . . . .
> 29 U.S.C. § 203(s)(i)(A)(i)-(ii).

### i.  Single Enterprise Coverage

Because the FLSA is to be construed liberally, Dunlop v. Ashy, 555 F.2d 1228, 1234 (5th Cir. 1977), the Court must construe the definition of "enterprise" liberally, *Williams v. Johnny Kynard Logging, Inc.*, No. 2:11-CV-2138-VEH, 2013 WL 2107658, at *6 (N.D. Ala. May 10, 2013). To establish that two entities are a single enterprise, a

plaintiff must demonstrate: (1) related activities; (2) unified operation or common control; and (3) a common business purpose. Donovan v. Easton Land & Dev. Co., 723 F.2d 1549, 1551 (11th Cir. 1984).

Defendants are a single enterprise for purposes of coverage under the FLSA. There is a single business purpose; to provide medical care to patients. The companies share employees, officers, and expenses. Indeed, they maintain consolidated profit and loss statements, file consolidated taxes, and their bankruptcy was jointly administered. They also rely on each other to function.  FCID, for instance, has no revenues and relies solely on intercompany transfers from First Choice or Medical Group to cover its operating expenses. Based on the economic realities, it is clear that Defendants are a single enterprise for purposes of coverage under the FLSA. Additionally, whether viewed together, or independently, the financial records of the Defendants show gross business done in exceeded $500,000 during the relevant period.

### b.  Engaged in Commerce

An employee is deemed to be "engaged in commerce" where he:

> directly participat[es] in the actual movement of persons or things in interstate commerce by [1] working for an instrumentality of interstate commerce, *e.g.*, transportation or communication industry employees, or [2] by regularly using the instrumentalities of interstate commerce in his work, *e.g.*, regular and recurrent use of interstate telephone, telegraph, mails, or travel.

*Thorne,* 448 F.3d at 1266 (citing 29 C.F.R. §§ 776.23(d)(2), 776.24).

Here, Defendants entire infrastructure, including its scheduling, billing, patient records, claim submission, and banking is entirely clous based. In other words, employees are regularly "using the instrumentalities of interstate commerce in his work". In some instances, Defendants even directed employees to make the Athenahealth website the homepage on their computer because they would be using it so often.[73] Not surprisingly, the use of cloud-based systems factor in favor of finding coverage under the FLSA. *See*, Bolden v. Callahan, 595 F. Supp. 3d 727, 735-6 (E.D. Ark. 2022) (use of internet, cloud-based appointment program on an almost a daily basis factored in favor of finding coverage under FLSA.)

Defendants also had numerous employees utilizing lease equipment from outside the state of Florida, such as MRI, Ultrasound, and Xray Machines in furtherance of their jobs. Some of Defendants employees also sold durable medical equipment or used injections which originated from vendors located outside of Florida. Defendant's CEO regularly communicated with investors outside Florida and, before COVID, traveled in furtherance of his job duties.

By contracting with international companies to treat their crew while at port in Cape Canaveral, Defendants employees were engaged in commerce.  When Mr. Friedman and his staff communicated and negotiate with out-of-state doctors to join Defendants' medical practice, utilizing phones, email, and zoom, they were engaged

---

[73] **Exhibit K**

16

in commerce. By utilizing banks located outside the state of Florida to lease or pay vendors in different states, Defendants were engaged in commerce. It can hardly be said that this once publicly traded company, which did millions of dollars in business, including federal funding through Medicare and the VA, is not engaged in commerce as defined by the FLSA.

### "Employer" under FLSA/FMWA

The FLSA defines an employer as including "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). And "person" is defined as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a). "The FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." *Dole v. Elliott Travel & Tours, Inc.,* *942 F.2d 962, 965 (6th Cir. 1991)*.

### i.   *Joint Employer*

An employee may be jointly employed by several employers, who are all responsible for compliance with the FLSA. *See Layton v. DHL Exp. (USA), Inc.,* 686 F.3d 1172, 1175 (11th Cir. 2012) (citing 29 C.F.R. § 791.2(a)). Generally, a joint-employment relationship will be found where (1) "an arrangement [exists] between the employers to share the employee's services"; (2) "one employer . . . act[s] directly or indirectly in the interest of the other employer (or employers) in relation to the employee"; or (3)

"the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." 29 C.F.R. § 791.2(b)(1)-(3).

Here, employees were interchangeable between FCID and its subsidiary, Medical Group d/b/a/ Emerge. Indeed, in April 2022, Defendants moved numerous employees from FCID to Medical Group without notice or change in job duties. The work performed by these employees was integral to First Choice's medical practice and simultaneously benefited each of the subsidiary defendants. Indeed, there was functionally no distinction between any of these entities; They share common leadership, ownership, functions, revenue, offices, human resources, health care plans, branding, and goals.

### ii. Friedman's Individual Liability (FLSA)

Personal liability as an FLSA employer extends to individual corporate officers who have "`operational control of a corporation's covered enterprise,' which may be involvement in the day-to-day operation of the company or direct supervision of the employee at issue." *Moore v. Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013) (citation omitted). This inquiry "does not depend on technical or isolated factors but rather on the circumstances of the whole activity." Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1160 (11th Cir. 2008) (quotation marks omitted).

Even occasional control over business operations subjects an individual corporate officer to liability. *Olivas v. A Little Havana Check Cash, Inc.*, 324 F. App'x 839, 845 (11th Cir. 2009). The term "operational control" includes management of day-to-day business functions such as employee compensation, `direct responsibility for the supervision' of employees, or general operations." *Baltzley v. Berkley Group, Inc.*, 2010 WL 3505104, at *2 (S.D. Fla. Sept. 3, 2010) (finding similar allegations sufficient to establish individual liability) (quoting *Patel*, 803 F.2d at 638).

Several cases support the proposition that a relevant factor in the FLSA "employer" analysis is whether an individual is "a signatory on the business accounts." Solano v. A Navas Party Prod., Inc., 728 F. Supp. 2d 1334, 1342 (S.D. Fla. 2010). At least one Eleventh Circuit case considered relevant the fact that an individual "negotiated leases and vendor contracts." Moore, 708 F.3d at 1237. And whether the individual signed contracts — especially employee contracts — might be relevant to show his "involvement in the day-to-day operation of the company[.]" Id.

Other factors include whether the alleged employer "(1) had the power to hire and fire the employee[], (2) supervised and controlled [the employee's] work schedule[] or condition[] of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Rodriguez v. Jones Boat Yard, Inc., 435 F. App'x 885, 888 (11th Cir. 2011).

19

Mr. Friedman was an employer, as defined by the FLSA. He is the CEO and President of the Defendant companies and one of only two individuals with the authority to set or change the compensation of employees, hire or fire employees, and establish the terms and conditions of their employment. [74] Mr. Friedman also negotiates leases for the business, holds signatory authority to sign checks and execute contracts on behalf of the business. During the relevant time period, leadership's communication with employees regarding the enterprise's operations was filtered through Mr. Friedman and only sent with his approval. He oversaw the day-to-day operations of the enterprise and its financial viability. There can be no doubt that Mr. Friedman exercised operational control over the business, and as such, is an employer, as defined by the FLSA.

**Minimum Wage Damages**

Between June 13, 2022, and July 27, 2022, Plaintiff worked 251.38 hours for which she was not paid. The federal minimum wage was $7.25 while the Florida Minimum wage was $10.00 per hour. In total, Plaintiff is owed $2,513.80 in minimum wage damages.[75]

---

[74] **Exhibit L**
[75] Calculated at $10.00 per hour.

**Liquidated Damages**

Pursuant to § 216(b), "[a]n employer who violates the FLSA's overtime provisions is liable to the employee for the employee's unpaid overtime compensation and for liquidated damages equal to that unpaid overtime compensation." *Meeks v. Pasco Cnty. Sheriff,* 688 F. App'x 714, 717 (11th Cir. 2017). Liquidated damages must be awarded absent a finding that the employer acted in good faith and under the reasonable belief that it was in compliance with the FLSA. *Joiner v. City of Macon,* 814 F.2d 1537, 1539 (11th Cir. 1987) ("[L]liquidated damages are mandatory absent a showing of good faith.") (citation omitted).

Here, Defendants assert that they did not pay the wages at issue because they did not have the funds, however this is not a defense to the FLSA. Moreover, the fact that the employees were asked to work despite the fact that the company knew it could not pay them prevents any good faith defense. As such, liquidated damages are required.

**Count III: Unpaid Wages**

Claims for unpaid wages under Florida common law are typically pleaded as breach of contract claims. *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1271 (11th Cir. 2009). In order to state a valid breach of contract claim, "Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of

that contract; and (3) damages resulting from the breach." *Id.* at 1272 (citation omitted).

There is no dispute that Plaintiff worked but was not paid her wages for that work. Indeed, Defendants admit that Plaintiff is owed her wages. During the last few pay periods at issue here, Plaintiff's paychecks were coming from Medical Group. Plaintiff worked 251.38 hours between June 13, 2022, and her final day on July 27, 2022, but has not received any pay for those hours worked between nor was she compensated for July 4, 2022. Plaintiff also used 3.92 hours of PTO during this period and had another 15.4 hours vested. Based on her rate of pay of $15.00 per hour, Plaintiff is due $3,770.70 in unpaid wages, $120.00 in unpaid holiday (July 4th), and, $290.00 in PTO. [76] Additionally, Plaintiff incurred $210.00 in overdraft fees as a result of her unpaid wages, which Mr. Friedman promised to pay in his April 7, 2022, memo.[77]

## Count IV: ERISA

Section 1132(a)(3) permits a cause of action to recover money equal to the insurance benefits lost due to the defendants' breach of fiduciary duty. Gimeno v. NCHMD, Inc., 38 F.4th 910, 914 (11th Cir. 2022). To establish liability for a breach of fiduciary duty under any of the provisions of ERISA § 502(a), a plaintiff must first

---

[76] Doc. 16.

[77] Exhibit H. p. 1

22

show that the defendant is in fact a fiduciary with respect to the plan. *Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 289 (11th Cir.1989)* ("non-fiduciaries cannot be held liable under ERISA"). ERISA provides, in part:

> a person is a fiduciary with respect to the plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan *or exercises any authority or control respecting management or disposition of its assets*, …or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
>
> ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (*Emphasis added*).

Once employee contributions are withheld, the withheld monies are deemed to be held in trust for the Plan, even if the funds remain in the Defendants general checking account. In re College Bound, Inc., 172 B.R. 399 (Bankr. S.D. Fla. 1994); *See also* *Professional Helicopter Pilots Ass'n v. Denison, 804 F.Supp. 1447 (M.D.Ala.1992)* (withheld employee wages became plan assets as soon as wages were deducted); US v. Grizzle, 933 F.2d 943,947-48 (11th Cir. 1991)(Assets of an employee benefit plan include employee contributions which are withheld from employees' paychecks by employers).

An employer may be held liable where it retains employee contributions for operational expenses instead of forwarding the funds per the plan. *See*, Pension Benefit Guaranty Corporation v. Solmsen, 671 F.Supp. 938 (E.D.N.Y.1987) (an employer who had assumed the duty to forward employee contributions to the benefit plan but allocated the monies to corporate expenses rather than to the employee benefit plan, was held liable for the misuse of plan assets.)

Here, Defendants deducted insurance premiums from Plaintiff's paychecks which were intended to be forwarded to Florida Blue and United Healthcare. Instead, starting in November 2021, those funds remained in Defendants' general operating account. Both the Florida Blue and United Healthcare plans were canceled due to non-payment. In fact, Defendants never paid anything to United Healthcare and the plan functionally never existed as a result. Even more troubling, Defendants were unable to pay United Healthcare because they used plan assets to make payments to their corporate officers, including Mr. Friedman.

As such, there can be no dispute that Defendants breached their fiduciary duties owned to Plaintiff by misappropriating Plan Assets for operational expenses; namely, Plaintiff's payroll deductions totaling $2,682.57 which were not held in trust or forwarded to the respective insurer. As a result of these breaches, Plaintiff was not insured and her medical claims totaling $ 35,999.31, which were otherwise covered, were denied by her primary, employer provided insurance.  Therefore, Plaintiff is entitled to an equitable surcharge for losses caused by Defendant's breach. [78]

**<u>Attorney's Fees and Costs</u>**

An additional element of Plaintiff's claim is the recovery of attorney's fees and costs. Specifically, 29 U.S.C. § 216(b) (FLSA), Fla. Stat. § 448.110(6)(c)(1) (FMWA), Fla. Stat. §448.08 (Unpaid Wages), 29 U.S.C. § 1132(g)(1)(ERISA)authorizes an award of

---

[78] *Gimeno v. NCHMD, INC.*, 38 F.4th 910 (11th Cir. 2022).

attorney's fees and costs to the prevailing plaintiff(s).  To the extent that the Court grant's Plaintiff's motion for summary judgment, Plaintiff request that the court grant leave to file a separate motion in accordance with Local Rule 7.01

**WHEREFORE**, Plaintiff respectfully requests the entry of a Summary Judgment in her favor and against the Defendants, for all wages and benefits due to her, liquidated damages, any other relief that this court deems fit.

Dated this 2nd  day of October 2023.

ARCADIER, BIGGIE & WOOD, PLLC
/s/ Joseph C. Wood Esquire
Joseph C. Wood, Esquire

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original of the foregoing was filed with the Clerk of Court by using the CM/ECF system, on this 2nd day of October 2023. Counsel of Record for all parties will receive notice of the electronic filing.

ARCADIER, BIGGIE and WOOD, PLLC

*/s/ Joseph C. Wood, Esquire*
Joseph C. Wood, Esquire
Florida Bar No.: 0093839
Maurice Arcadier, Esquire
Florida Bar No. 0131180
2815 W. New Haven, Suite 304
Melbourne, Florida 32904
Primary Email: Office@ABWlegal.com
Secondary Email: Wood@ABWlegal.com
Phone: (321) 953-5998
Fax: (321) 953-6075